UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH DOE, et al., | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 22-cv-10702-ADB |
| v. | * | |
| | * | |
| AYLA GAVINS, et al., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

        Joseph Doe, James Doe, Jane Doe, Casey Roe, and Barbara Roe (collectively, "Plaintiffs") allege that the City of Boston, Ayla Gavins, Jenerra Williams, and Nakia Keizer (collectively, "Defendants") created and/or condoned (1) an unsafe environment at Mission Hill K-8 School which left Joseph Doe and Casey Roe at greater risk to sex-based and physical assaults and harassment by other students, and (2) a policy that discriminated against students with disabilities, like Joseph and Casey, in failing to provide appropriate specialized educational services.  [ECF No. 4 ("Amended Complaint" or "Am. Compl.")].  Plaintiffs assert claims for violations of 42 U.S.C. § 1983; Title IX, 20 U.S.C. § 1681; Title II of the Americans with Disabilities Act ("ADA"); and Section 504 of the Rehabilitation Act ("Rehab Act").  [Id. ¶¶ 159–216].  Now before the Court is the City of Boston's motion to dismiss.  [ECF No. 38].  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

# I.       BACKGROUND

## A.       Factual Background[1]

### 1.       The Parties

Plaintiffs Joseph Doe and Casey Roe are minor children and former students of Mission Hill K-8 School ("MHS").  [Am. Compl. ¶¶ 1, 4, 52, 116].  Plaintiffs James Doe and Jane Doe ("Mr. and Mrs. Doe" or the "Does") and Barbara Roe ("Ms. Roe") are their parents.  [Id. ¶¶ 2–3, 5].

Defendant City of Boston ("COB") "is responsible for the formulation and implementation of all official government laws, policies and procedures for the Boston Public Schools ('BPS'), and oversees the operation of the BPS through the Boston School Committee." [Am. Compl. ¶ 7].  MHS is a "pilot school," and as such it "has autonomy over aspects of its operations, including budget, staffing, governance, professional development, curriculum/assessment and school calendar."  [Id. ¶¶ 8, 15].  Nevertheless, the COB, "through its employees and the Mission Hill School Governing Board ('Governing Board'), was responsible for the oversight and operation of [MHS]."  [Id. ¶ 8].  During the relevant time period, Defendant Ayla Gavins ("Ms. Gavins") was the principal of MHS, and Defendants Jenerra Williams ("Ms. Williams") and Nakia Keizer ("Mr. Keizer") were MHS teachers.  [Id. ¶¶ 10–12].

### 2.       Mission Hill K-8 School and Alleged Misconduct

As principal, Ms. Gavins, with assistance from Ms. Williams and Mr. Keizer, created a culture at MHS where, among other things, "bullying and sexual assault flourished" and

---

[1] Facts are drawn primarily from the Amended Complaint, which the Court assumes to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).  Facts are also drawn from exhibits attached to and cited in the Amended Complaint, which are deemed incorporated for purposes of this Motion.  See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008).

"students with disabilities were provided with inadequate or makeshift accommodations and educational programs." [Am. Compl. ¶¶ 35–36]. Specifically, Ms. Gavins "affirmatively and actively discouraged staff from filing bullying reports as required by M.G.L. c.71 §37O and BPS policy" ("Bullying Reports"), and discouraged "reporting and recording . . . incidents of physical and sexual abuse as required by M.G.L. c.119 §51A" ("51A Reports"). [Id. ¶¶ 24–27]. Instead, Ms. Gavins "encouraged MHS staff to handle bullying and similar issues 'in house' and to report to her rather than to follow BPS protocols and Massachusetts state laws." [Id. ¶ 32]. As a result, "MHS students who were bullied became reluctant to report acts of bullying to teachers" or "ceased to report acts of bullying" altogether. [Id. ¶¶ 22–23]. At the same time, Ms. Gavins "developed a practice of assuring parents that their concerns about safety were being addressed," and a "pattern of blaming the victims of bullying for the conduct of their aggressors" and "protecting certain children at the expense of others." [Id. ¶ 19].

"MHS was [also] required to adhere to . . . Section 504 of the [Rehab Act] and the [ADA] . . . by creating and implementing Individualized Education Plans ('IEPs') for students with identified disabilities and by adopting, enforcing, and adhering to policies of non-discrimination against students with disabilities." [Am. Compl. ¶ 26]. Nonetheless, Ms. Gavins "affirmatively and actively discouraged staff from evaluating students with learning or behavioral issues and from identifying students as having disabilities" and did not develop IEPs for students who needed them. [Id. ¶ 28]. Ms. Gavins then "placate[d] parents by promising that their children would receive services, even though such services could not be provided without [IEPs] and were not in fact provided." [Id.].

"The MHS Governing Board conducted regular evaluations of Ms. Gavins' job performance and approved of Ms. Gavins' leadership and policies, and recommended that BPS

renew her contract."  [Am. Compl. ¶ 33].  "BPS adopted these recommendations and approved

the annual renewals."  [Id.].  Additionally, Plaintiffs allege that despite having "notice of

problems at MHS," the COB "ignore[ed] and condon[ed] the unsafe conditions at MHS,

including frequent and repetitive assaults on Joseph[, Casey,] and other students."  [Id. ¶¶ 182,

204].  Further, the COB "failed to train and supervise their employees, including but not limited

to [Ms. Gavins, Ms. Williams, and Mr. Keizer]."  [Id. ¶¶ 183, 205].

### 3.   Previous Litigation

Another group of plaintiffs filed a lawsuit against the COB, Ms. Gavins, and other

defendants in state court in June 2017, raising claims related to alleged sex-based assaults by

"A.," an MHS student, on other MHS students.  See Complaint, Doe1 v. Bos. Pub. Schs., No.

1784CV01866 (Mass. Sup. Ct. June 15, 2017).  After the case was removed to this Court and the

Court denied defendants' motions to dismiss the amended complaint, see Doe1 v. Bos. Pub.

Schs., No. 17-cv-11653, 2019 WL 1005498 (D. Mass. Mar. 1, 2019), the case proceeded to

discovery.  While in discovery, in July 2021, the case settled.  [Id., ECF No. 95].

### 4.   Investigations and Closure of MHS

There have been a number of investigations into alleged misconduct at MHS.  Plaintiffs

incorporate the findings from several of those investigations into their Amended Complaint.  See

Trans-Spec Truck Serv., Inc., 524 F.3d at 321.[2]

In 2015, then-BPS Superintendent John McDonough hired attorney Joseph Coffey

("Attorney Coffey") to conduct an independent investigation into complaints related to special

education at MHS.  [Am. Compl. ¶ 37].  The resulting report ("2015 Coffey Report"),

---

[2] In their Opposition, Plaintiffs indicate that they are aware of other reports on investigations into
MHS that they did not discuss or incorporate into their pleadings, because those reports were not
publicly available or had not yet been released.  [ECF No. 42 at 2 n.1].

"concluded, <u>inter alia</u>, that Ms. Gavins' failures, inactions, and omissions with respect to the provision of special education services to MHS students constituted conduct unbecoming a principal and warranted discipline." [<u>Id.</u>].  Despite this and other findings in the 2015 Coffey Report, the Governing Board of MHS and BPS did not discipline Ms. Gavins.  [<u>Id.</u> ¶ 38].

In 2019 and 2020,[3]

[t]he Massachusetts Department of Elementary and Secondary Education ["DESE"] also conducted four separate investigations regarding Joseph's experience at MHS, and found that:

a. MHS failed to comply with bullying laws;
b. MHS failed to implement an appropriate 504 plan for Joseph;
c. MHS improperly secured Joseph's student records and permitted unlawful access to those records; and
d. MHS failed to provide timely access to student records.

[Am. Compl. ¶ 39].[4]

In 2021, BPS Superintendent Brenda Cassellius commissioned another independent investigation by Attorney Coffey.  [Am. Compl. ¶ 40].  Although students' identifying information is redacted in the resulting report ("2021 Coffey Report"), Plaintiffs allege that "Attorney Coffey was asked specifically to address Ms. Gavins' handling of bullying incidents

---

[3] Hinckley Allen ("HA"), <u>Phase I – Investigation Report (Redacted)</u>, Investigation Conducted On Behalf Of The Boston Public Schools Regarding Allegations Of Inadequate Leadership And A Number Of Safety Concerns, Including Bullying, Sexual Abuse, And An Unsafe Environment 22, 110–11 n.85 (2022), https://www.bostonpublicschools.org/cms/lib/MA01906464/Centricity/Domain/162/BPS%20Phase%20I%20Report%20Redacted%204%2025%202022.pdf ("2022 HA Phase I Report").  The Amended Complaint incorporates the 2022 HA Phase I Report by reference.  [Am. Compl. ¶ 42].

[4] "DESE [also] found that [BPS] had failed to properly report bullying pursuant to state law and that a violation of M.G.L. c. 71, § 370 had occurred with regard to the specific concerns raised by MH Parent 3 and 4 [who appear to be the Does], as . . . [BPS] had not met the basic requirements for addressing the allegations of bullying, as was required by the [BPS's] Bullying Prevention and Intervention Plan."  2022 HA Phase I Report at 22.

involving Joseph and her failure to implement disability accommodations as required by his 504 plan." [Id.; see ECF No. 1-3].

In September 2021, Superintendent Cassellius hired law firm Hinckley Allen ("HA") to conduct a further investigation into "allegations of misconduct by Ms. Gavins and others at MHS, including their handling of bullying, sexual misconduct and/or sexual assaults, and their treatment of students with disabilities." [Am. Compl. ¶ 41]. According to the resulting report ("2022 HA Phase I Report"), "[w]hat . . . emerged [from the investigation] [wa]s a picture of a failed school, one that largely hid behind its autonomous status and the philosophical ideals of . . . [several MHS administrators, including Ms. Gavins], often to the detriment of the Boston Public School students it served." 2022 HA Phase I Report at 9.

On April 27, 2022, Superintendent Cassellius recommended to the Boston School Committee that MHS be closed. [Am. Compl. ¶ 50]. On May 5, 2022, the Boston School Committee voted to adopt that recommendation and close MHS. [Id. ¶ 51].

5.    Joseph Doe

Joseph started at MHS in first grade, midway through the 2014–2015 school year. [Am. Compl. ¶ 52]. While attending MHS, Joseph began to show "signs of a disability, including an inability to read social cues, attention deficit hyperactivity disorder, and neurologic sequelae of a traumatic brain injury." [Id. ¶ 54]. Joseph also has a gender-nonconforming appearance. [Id. ¶ 69]. In his first-grade year, Joseph was physically bullied by other MHS students on numerous occasions, including being pushed to the ground, hit on the back of his head, taunted into fighting, and stabbed on the side of his face with a pencil. [Id. ¶ 58]. This physical bullying continued during his second-grade year, 2015–2016. [Id. ¶ 59]. He also began to experience bullying due to his gender-nonconforming appearance, such as students telling Joseph he needed

to cut his hair and calling him "Miss."  [Id. ¶¶ 69–70].

In April 2016, in the MHS gymnasium, "Joseph suffered a traumatic brain injury ('TBI'), skull fracture, and concussion." [Am. Compl. ¶ 60].[5]  The physicians who treated Joseph following this incident recommended that Joseph receive a 504 plan for academic accommodations related to his injury and that Jospeh avoid activity more strenuous than walking.  [Id. ¶ 61].  The Does told Ms. Gavins about these recommendations, and she promised to provide him with "accommodations that would be superior to a 504 plan, including a one-on-one aide to assure Joseph's safety as he recovered from the TBI." [Id. ¶¶ 62, 65].  In fact, MHS never provided an aide or any other one-on-one assistance for Joseph.  [Id. ¶¶ 66, 68].  In addition, Ms. Gavins allowed Joseph to continue to participate in activities that resulted in "repeated head trauma."  [Id. ¶¶ 62, 67].  Over the weeks that followed his injuries, other MHS students hit Joseph on the head on six occasions, "thereby subjecting him to further injury and long-term consequences."  [Id. ¶ 67].

In the middle of this school year, Mrs. Doe and other parents attended a community meeting with Ms. Gavins to discuss safety at MHS.  [Am. Compl. ¶ 71].  Ms. Gavins dismissed their concerns and assured them MHS was providing a safe environment.  [Id.].  In mid-June 2016, after Joseph was attacked by a group of classmates, Ms. Gavins acknowledged that he had been the victim of a "a string of incidents," but "justified the attacks, defended the attackers, and blamed Joseph, saying that he was 'struggling to self-regulate and failing to read social cues.'" [Id. ¶¶ 72–73].  When the Does met with Ms. Gavins at end of that month, Ms. Gavins dismissed

---

[5] Although Ms. Gavins told the Does that she investigated the incident and found no one was at fault, Ms. Gavins did not investigate until after she made this representation to the Does and her investigation only consisted of talking to a few staff members.  [Am. Compl. ¶¶ 63–64]. Plaintiffs assert that the circumstances of Joseph's injuries have "never been adequately explained or investigated."  [Id. ¶ 60].

their concerns.  [Id. ¶¶ 75–76].

In his third- and fourth-grade years, 2016–2018, Joseph continued to be physically bullied by his classmates, including by being pushed, hit, slapped, punched, and "teas[ed] about his shoes, clothes, and long hair."  [Am. Compl. ¶¶ 77, 80].  During his third-grade year, 2016–2017, Ms. Gavins "deliberately suppressed the creation of incident reports to create the impression with the Governing Board and others" that the number of bullying incidents had declined.  [Id. ¶ 79].  In fourth grade, Joseph was "improper[ly] restrain[ed]" by an MHS paraprofessional.  [Id. ¶ 81].  He was also kicked in the head by another student.  [Id.].  After these incidents, the Does homeschooled Joseph for the remainder of the year.  [Id. ¶¶ 81–82].

Joseph returned to MHS for his fifth-grade year, 2018–2019.  Over this year, he experienced:

> continued and escalating bullying, including being pushed against a bathroom wall and choked, threatened by a student that he would "f you up," and threatened by another student that he would bring a gun to school to kill Joseph.  The bullying incidents also included other students pushing, slapping, punching, kicking, and taunting Joseph, as well as gender-based teasing about his shoes and clothes and pulling off the hat or bandanna that he wanted to wear to cover his hair.  He was also followed after school by students who threatened him, and hit with a chair by another student.

[Am. Compl. ¶ 83].  Joseph was also struck in the head with a cellphone by Ms. Williams who then refused to allow him to see the nurse.  [Id. ¶ 84].  When the Does approached Ms. Gavins about the lack of reports for these incidents, Ms. Gavins replied, "[i]f I did an incident report every time he got hurt, I would be doing it all the time."  [Id. ¶ 89].

"In the fall of 2018, Mr. and Mrs. Doe elevated their concerns about the pervasive and continual bullying" of Joseph to BPS leadership, including then-Superintendent Al Taylor.  [Am. Compl. ¶ 91].  When Ms. Gavins learned of this, she created false, back-dated entries in Joseph's student record "stating that he had committed suspendable disciplinary violations" and told the

Does, "[w]hen you get the Superintendent's office involved that is what happens."  [Id. ¶¶ 93–94].[6]

In total, while attending MHS, Joseph "suffered physical or mental trauma at the hands of other students on at least 40–45 occasions," including impacts to his head and neck at least 30–35 times.  [Am. Compl. ¶ 91]; see [ECF No. 1-4].  These incidents were concealed from the Does by MHS staff on at least 20–25 occasions.  [Am. Compl. ¶ 91].  All told, the Does reached out to Ms. Gavins, at least 25 times; Mr. Keizer, 22 times; Ms. Williams, 15 times; and other BPS staff and leadership, 23 times, to raise their concerns about Joseph's safety and his academic difficulties.  [Id.].

As noted above, following Joseph's April 2016 injuries, Ms. Gavins ignored his physicians' recommendations that a 504 Plan be created for him.  [Am. Compl. ¶ 68].  Joseph was diagnosed with "ADHD, Specific Learning Disability, with a significant weakness in processing speed" in July 2016.  [Id. ¶ 96].  After the Does communicated Joseph's diagnosis to Ms. Williams, she told them "that Joseph's disabilities could be adequately managed . . . without a formal IEP or 504 plan."  [Id.].  It was not until November 2018, nearly two and half years after his physicians first recommended it, that a 504 Plan was created for Joseph.  [Id. ¶ 97].

Joseph transferred out of MHS to another BPS pilot school in September 2019, the beginning of his sixth-grade year, before qualifying for placement in a private out-of-district school, where he started in January 2020.  [Am. Compl. ¶¶ 99–100].

6.    Casey Roe

Casey entered "Kindergarten-0" at MHS as a special education student in the fall of 2012.  [Am. Compl. ¶ 116].  Casey "suffered from numerous medical, behavioral, and emotional

---

[6] "BPS and MHS eventually acknowledged that eighteen entries were improperly created and entered in Joseph['s] record" and expunged them.  [Am. Compl. ¶ 95].

disabilities and conditions," including "dyslexia, food allergies, sensory deficits, vision problems, mood disorder, ADHD, and high impulsivity with difficulty in regulating her emotions and behavior." [Id. ¶ 108]. These conditions made her "eligible for and entitled to special education services to be provided under" an IEP. [Id.].

Ms. Roe withdrew Casey from MHS a few weeks into her first year because "[Casey] had difficulty controlling her behavior and was the subject of bullying and abuse by other children." [Am. Compl. ¶ 117]. Casey reentered MHS in February 2014 as a Kindergarten-1 student. [Id. ¶ 118]. That spring, Casey "was subjected to verbal and physical abuse from other students," including two classmates, N. and K., who repeatedly called her expletives. [Id. ¶ 120].

Throughout the following school year, 2014–2015, Casey continued to be the target of verbal and physical harassment from the same two classmates, and others who called her expletives ("f–cking bitch") and were physically aggressive toward her on a regular basis. [Am. Compl. ¶ 124]. "Ms. Roe repeatedly expressed to [Casey's teacher] that she was concerned about Casey's safety, because Casey was frequently involved in aggressive physical incidents with N. and K." [Id. ¶ 126]. In addition, another student, A., whose behavior was the subject of Doe1 v. Bos. Pub. Schs., "repeatedly harassed" Casey on school grounds. [Id. ¶¶ 127–128]. This harassment included "asking to see her underwear, asking her to kiss him, trying to kiss her, physically holding her down, and removing her shoes so she couldn't run away from him." [Id. ¶ 128]. The only response to A.'s conduct by Casey's teacher and other MHS staff was to give A. a "timeout," [id. ¶ 129], and Ms. Gavins merely told Ms. Roe that A. "ha[d] problems," [id. ¶ 130]. That spring, "boys started exposing themselves regularly in the presence of Casey and other female students." [Id. ¶ 131].

During the 2015–2016 school year, Casey suffered physical bullying on an almost-daily basis, including "boys pulling her pants down during and after school"; a classmate "urinat[ing] in [her] cubby"; a classmate "punch[ing] [her] in the stomach, causing her to vomit"; a classmate hitting her in the head and calling her an expletive ("f–cking bitch"); and a classmate "push[ing] [her] down the stairs."  [Am. Compl. ¶ 136].  When Ms. Roe reported these incidents to Ms. Gavins, Ms. Gavins was dismissive (on one occasion, replying, "I don't know what you want me to do," [id. ¶ 137]), and blamed Casey for the mistreatment (e.g., saying Casey "doesn't know when to stop," [id. ¶ 138]).  "Rather than separating the [students who had harassed her] or protecting Casey with a safety plan or otherwise," Ms. Gavins had Casey participate in a "friendship" club with two of these students, after which the two "increased their physical aggression toward Casey."  [Id. ¶¶ 139–140].

Although it is not entirely clear from the Complaint, it seems that an IEP was created for Casey.  See [Am. Compl. ¶ 141 ("Ms. Roe also expressed to Ms. Gavins' repeated concerns about Casey's lack of academic progress, receiving repeated assurances that Casey's IEP was appropriate, and that Casey, as other children, would learn at her own pace.")].  Nevertheless, "Casey was determined to be in need of additional reading services as a result of an evaluation in fall 2015, but these services were never provided to her."  [Id. ¶ 142].

Ms. Roe removed Casey from MHS in the spring of 2016.  [Am. Compl. ¶ 152].

**B.       Procedural History**

Plaintiffs filed their original complaint in this action on May 9, 2022, [ECF No. 1], and an Amended Complaint on June 22, 2022, [ECF No. 4].  The COB filed the instant motion to dismiss all of Joseph and Casey's claims against the COB, on February 6, 2023, [ECF No. 38], which Plaintiffs opposed on February 28, [ECF No. 42].

II.      **STANDARD OF REVIEW**

On a motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  While detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The facts alleged, taken together, must "state a claim to relief that is plausible on its face."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).  When assessing the sufficiency of a complaint, the Court first "separate[s] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).  "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, a claim may be dismissed.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

III.      DISCUSSION

A.       Section 1983

The Amended Complaint alleges that the COB violated the Constitution by depriving

Joseph and Casey of their liberty interest in bodily integrity.  [Am. Compl. ¶¶ 185, 207].[7]  The

COB responds that Plaintiffs have failed to make out a constitutional violation, [ECF No. 39 at

6–12], and even assuming they had, they have failed to allege municipal liability, consistent with

Monell v. Department of Social Services, 436 U.S. 658 (1978), [ECF No. 39 at 12–13].

1.      Constitutional violation

"[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right

protected by the Constitution or laws of the United States and (2) that the perpetrator of the

violation was acting under color of law."  Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621

(1st Cir. 2000).  Where, as here, plaintiffs allege a substantive due process claim, they "must first

show a deprivation of a protected interest in life, liberty, or property," and, second, "that the

deprivation of this protected right was caused by government[] conduct."  Rivera v. Rhode

_____

[7] Plaintiffs also raise § 1983 claims based on a right to a public education, [Am. Compl.
¶¶ 181–187, 203–209], which the COB argues must be dismissed because "the United States
Constitution does not provide an individual a 'right to a public education,'" [ECF No. 39 at 6
(quoting Plyer v. Doe, 457 U.S. 202, 221 (1982))].  In their Opposition, Plaintiffs indicate that
they do not argue that such a right exists for purposes of this Motion, because the Court
previously held that there was no right to a public education.  See [ECF No. 42 at 9 n.7 (citing
Doe1 v. Bos. Pub. Sch., 2019 WL 1005498, at *6)].  In Doe1, the Court noted that "public
education is not a fundamental right guaranteed by the Constitution," but also stated that it was
not "examining the extent to which a right to public education may be cognizable under Section
1983."  2019 WL 1005498, at *6 (citations omitted).  Nevertheless, the Court finds that in failing
to address this argument for dismissal, Plaintiffs have waived any objection.  See, e.g., Peterson
v. E. Bos. Sav. Bank, No. 17-cv-11776, 2018 WL 4696746, at *2 (D. Mass. Sept. 29, 2018)
("[P]laintiffs' response to the motion to dismiss does not offer any argument against the
defendants' judicial estoppel ground for dismissal.  Their failure to oppose this argument
amounts to a waiver of any objection to it.").  Thus, the COB's motion to dismiss Plaintiffs'
§ 1983 claims based on a right to receive a public education is GRANTED.

Island, 402 F.3d 27, 33–34 (1st Cir. 2005).  Plaintiffs' allegations largely focus on harms

inflicted by students, rather than by MHS officials.  As a general matter, a state's "failure to

protect an individual against private violence simply does not constitute a violation of the Due

Process Clause."  DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).

However, where the state plays a role in the creation or enhancement of a danger, an affirmative,

constitutional duty to protect the individual from harm by a private actor may arise.  See Rivera,

402 F.3d at 34–35 (citing DeShaney, 489 U.S. at 200–01).[8]  To establish liability under the

so-called state-created danger theory, plaintiffs must show:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
>
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
>
> (3) that the act or acts caused the plaintiff's harm; and
>
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

Irish v. Fowler, 979 F.3d 65, 75 (1st Cir. 2020).  The COB argues that Plaintiffs have failed to

allege any affirmative act committed by Defendants that created or enhanced the danger to

Joseph or Casey or any action or inaction by Defendants sufficient to "shock the conscience."

[ECF No. 39 at 8–9].

---

[8] The state may also have a constitutional duty to protect where there is a "special relationship" between the state and an individual.  See Rivera, 402 F.3d at 34–35 (citing DeShaney, 489 U.S. at 200–01).  "As a general matter, courts have declined to find a 'special relationship' between a public school and its students," Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 297 (D. Mass. 2017), although the First Circuit has recognized the possibility that "in narrow circumstances" a school or school employees might have a "'specific' duty" to render aid to a student in peril, Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999).  Plaintiffs do not argue that the "special relationship" theory applies here.

A failure to act does not satisfy the affirmative act element of this analysis.  See Rivera, 402 F.3d at 37.  "Because the line between an affirmative act and an omission may be difficult to draw, . . . courts in other jurisdictions have analyzed whether a government official's alleged specific act placed the individual 'in a position of relatively less safety than [he or she] enjoyed before the affirmative act.'"  Hayes v. Town of Dalton, No. 21-cv-30055, 2022 WL 488466, at *6 (D. Mass Feb. 17, 2022) (second alteration in original) (citation omitted).  "If the person was less safe, the affirmative act element may be satisfied."  Id. (collecting cases); see also Doe v. Town of Wayland, 179 F. Supp. 3d 155, 166–69 (D. Mass. 2016) (finding an affirmative act where school actively encouraged a friendship between abuser and victim's brother in a way that left the victim "more vulnerable than if [school officials] had never acted").

As in Doe1 v. Bos. Pub. Schs., whether Defendants engaged in affirmative acts is a close question.  See 2019 WL 1005498, at *4–5.  The Court finds that Plaintiffs have narrowly alleged sufficient facts to survive the COB's motion to dismiss their state-created danger claims.  The Court can infer that by actively suppressing the filing of Bullying Reports and 51A Reports,[9] falsifying Joseph's disciplinary records in retaliation for the Does raising their concerns to

---

[9] According to the 2022 HA Phase I Report, "[s]everal parents shared a specific concern that Mission Hill School had terminated MH Staff 3 because [REDACTED] had filed a 51A report concerning MH Student 1 or pushed out [REDACTED] because [REDACTED] did not conform to MH Admin 3['s] view of keeping matters in-house."  2022 HA Phase I Report at 85.  In speaking with investigators, MH Staff 3 said they would not label their "departure 'retaliation' . . . [and] [REDACTED] said that [REDACTED] left because 'things were not working out.'"  Id.  The Report suggests there may have been various reasons for MH Staff 3 to leave MHS.  MH Staff 3 stated they felt "'pushed out' by [Ms. Gavins], who 'wanted to make it really clear that [staff] like [MH Staff 3] had to leave' and 'was not going to be part of some underground mission to change the school.'"  Id.  Further, "after MH Staff 3 filed a 51A report in November 2014, MH Admin 3 reassigned MH Student 1 to MH Staff 2's classroom with little, if any, explanation."  Id. at 86.

Superintendent Taylor, and protecting rather than disciplining students that bullied others,[10] Ms. Gavins and other MHS officials' actions left Joseph and Casey more vulnerable to harassment and less safe.  These affirmative acts amount to more than just knowing what Joseph and Casey were experiencing or failing to intervene: they could have impeded external intervention[11] and emboldened students to continue physically bullying others.  Thus, Ms. Gavins plausibly enhanced the threat of harm to Joseph and Casey and proximately caused their injuries.  Contra Deshaney, 489 U.S. at 201 ("While the State may have been aware of the

---

[10] For example, the 2021 Coffey Report described an instance, in fact "the first occasion that [Attorney Coffey] found any response to an acknowledged incident of bullying by" Ms. Gavins, in which Ms. Gavins emailed teachers about "reports of repetitive bullying" by a student, including "pushing [REDACTED], 'leaving a tennis ball size bruise on her arm, throwing a football at her face, knocking her lunch out of her hand,'" and "calling her names and sa[ying] other mean things."  [ECF No. 1-3 at 14].  Despite flagging these incidents for teachers, she did not "notify the victim's parents" or BPS, did not create a "structured safety plan," and did not "discipline the aggressor."  [Id.].  Ms. Gavins' only remedy was to direct teachers to keep this student away from the student he was bullying.  [Id.].  Attorney Coffey found that Ms. Gavins thus "protected the aggressor and enabled him to harm other students at the school."  [Id.].

[11] Under Massachusetts law, specified persons, including school staff, must report allegations of child abuse to DCF if he or she "has reasonable cause to believe that a child is suffering physical or emotional injury resulting from . . . abuse inflicted upon him [or her] which causes harm or substantial risk of harm to the child's health or welfare, including sexual abuse."  Mass. Gen. Laws ch. 119, § 51A(a).  Section 51A "imposes an affirmative obligation to report when there is 'reasonable cause to believe' abuse or neglect has taken place and sets a low threshold for what constitutes reasonable cause."  Doe v. Bradshaw, 203 F. Supp. 3d 168, 183 (D. Mass. 2016) (citation omitted).  Following the receipt of a 51A Report, DCF must promptly investigate it, make a written finding of whether the suspected abuse is substantiated, and "immediately report to the district attorney and local law enforcement authorities, a sexually exploited child."  Mass. Gen. Laws ch. 119, § 51B(a).

Similarly, pursuant to Mass. Gen. Laws ch. 71, § 37O, school staff have an affirmative obligation to report instances of bullying, which in turn triggers a principal's or another designee's affirmative obligation to investigate, and if they determine "bullying or retaliation has occurred," they must "take appropriate disciplinary action" and "notify the parents or guardians of a perpetrator . . . [and] of the victim."  Mass. Gen. Laws ch. 71, § 37O.

dangers that [minor plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

To rise to the level of a constitutional violation, the state's actions must also "shock the conscience." Irish, 979 F.3d at 75. The First Circuit has held that:

> Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk. . . . Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

Id. The Court finds that Plaintiffs have again alleged conduct that meets this standard. For both Joseph and Casey, Plaintiffs allege numerous incidents of physical assault and harassment, and allege that such incidents escalated in frequency over time. Likewise, Plaintiffs allege that Ms. Gavins and others were aware of past harm and the continuing risk of future harm to both Joseph and Casey, and yet continued to take actions that sustained and enhanced this risk. The Does communicated their concerns about Joseph's safety to Defendants on numerous occasions, alleging they reached out to Ms. Gavins, Mr. Keizer, Ms. Williams, and other BPS staff and leadership, each at least 15 times. In response, in addition to those actions already discussed, Ms. Gavins downplayed their concerns, assured the Does of Joseph's safety while failing to institute a plan to protect him, implied that the harassment was Joseph's fault, and admitted that she did not file reports on every occasion because the incidents were so frequent. Similarly, Ms. Gavins ignored Ms. Roe's concerns about Casey's safety, and implied that, like Joseph, Casey's actions prompted the harassment. These facts are sufficient to show that, over a period of several years, Defendants had ample opportunity to reflect and yet continued to make decisions that plausibly put Joseph and Casey at greater risk of danger.

The Court thus finds that Plaintiffs have alleged viable substantive due process claims based on their right to bodily integrity.  As the Court previously cautioned in Doe1 v. Bos. Pub. Schs., 2019 WL 1005498, at *5, where, as here, private actors harmed Joseph and Casey, affirmative action (rather than inaction) by school officials is essential to this holding.  See Rivera, 402 F.3d at 36; Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 55 n.9 (1st Cir. 2006).  If, following discovery, there is no evidence that MHS officials committed affirmative acts that enhanced the danger to which Joseph and Casey were exposed, the Court will revisit its finding on summary judgment.

2.    Monell Liability

Under Monell, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  436 U.S. at 690–91 (emphasis omitted).  However, "a municipality may be held liable under a theory of respondeat superior for an employee's constitutional violation when 'execution of [the municipality's] policy or custom . . . inflict[ed] the injury.'"  Thomas, 267 F. Supp. 3d at 305 (quoting Monell, 436 U.S. at 694) (alterations in original).

"'A plaintiff can establish the existence of an official policy by,' inter alia, 'showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority.'"  Walden v. City of Providence, 596 F.3d 38, 55 (1st Cir. 2010) (quoting Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008)).  "Whether an official has th[e] requisite level of specific policymaking authority is a matter of state law."  Id. at 56.  In Massachusetts, "the school committee in each city or town has policymaking authority."  Thomas, 267 F. Supp. 3d at 306; see Mass. Gen. Laws ch. 71, § 37 ("The school committee in each city and town . . . shall establish educational goals and policies for the schools in the district . . . .").  Ms. Gavins, as the

principal of MHS, is not a policymaker for the school committee.  See McLaughlin v. City of Lowell, No. CIV.A. 94-5069, 1998 WL 224929, at *13 (Mass. Super. Ct. Apr. 3, 1998) (Gants, J.) ("In short, the school committee makes policy; the school superintendent and principals implement those policies.").[12]  As the Amended Complaint does not suggest that any municipal staff who were involved in the alleged misconduct possessed final policymaking authority for the school committee, Plaintiffs must ground their Monell claim on the execution of a municipal custom.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 n.10 (1986) ("A § 1983 plaintiff . . . may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state 'custom or usage.'").

In order to establish an official custom, plaintiffs must first plausibly allege that the custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)).  Second, plaintiffs must also show that "the custom [was] the cause of and the moving force behind the [constitutional violation]."  Wood v. Hancock Cnty. Sheriff's Dep't, 354 F.3d 57, 64 (1st Cir. 2003) (quoting Bordanaro, 871 F.2d at 1156). Evidence of a single incident of a constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or usage' within the meaning of Monell."  Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 16–17 (1st Cir. 1995).  Evidence of "multiple instances of

---

[12] See also Mass. Gen. Laws ch. 71, § 59B ("Principals . . . shall be the educational administrators and managers of their schools and shall supervise . . . their schools . . . subject to the supervision and direction of the superintendent); id. § 59 ("A superintendent . . . shall manage the system in a fashion consistent with . . . the policy determinations of that school committee.").

misconduct" that suggest a "systemic pattern of activity," however, may support an inference of a municipal custom.  See Town of Wayland, 179 F. Supp. 3d at 172–73 (citing Kibbe v. City of Springfield, 777 F.2d 801 (1985); Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225 (2005)).  Moreover, a municipality's failure to train its employees may be actionable under § 1983 where "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies."  Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011) (citations omitted).

Here, Plaintiffs allege Joseph and Casey experienced numerous incidents of physical and verbal harassment by other students,[13] and that because MHS had a culture of suppressing Bullying Reports and 51A Reports, very few reports were being filed.  In fact, the 2022 HA Phase I Report found that Ms. Gavins had filed no more than three Bullying Reports from 2011–2018, and that "[MHS] rarely reported [incidents of sexual misconduct] in accordance with [BPS] policies and Massachusetts law, namely BPS Superintendent Circulars LGL-13 and ETQ-3, and Mass. Gen. Laws. Ch. 119, § 51A."  2022 HA Phase I Report at 11–12.  Plaintiffs also allege that the COB "tacitly authorized the wrongful conduct by continuing to permit MHS to exercise autonomy, renewing Ms. Gavins' contract as principal, ignoring, and condoning the unsafe conditions at MHS, including frequent and repetitive assaults on Joseph[, Casey,] and other students, refusing to take action in response to notice of problems at MHS, including but not limited to the 2015 Coffey report, and by failing to prevent further incidents."  [Am. Compl.

---

[13] The 2022 HA Phase I Report also found that MHS "received a multitude of reports describing incidents of potential sexual misconduct and/or unsafe sexual behaviors involving each year from SY 2013-2014 to the present. . . . Between September 2013 and February 2021, investigators located written evidence of over 100 discrete events involving alleged sexually inappropriate behaviors by Mission Hill School students, of varying severity.  Of the approximately 102 documented incidents, only 45 were recorded on [MHS] Incident Report forms, or maintained as a formal incident."  2022 HA Phase I Report at 51.

¶¶ 182, 204].  Further, Plaintiffs allege that the COB failed to train its employees.  [Id. ¶¶ 183, 205].  Plaintiffs claim that these "actions or inactions" were part of a custom that ultimately fueled the violation of Joseph and Casey's constitutional right to bodily integrity.
[Id. ¶¶ 184–187, 206–209].

Although the 2015 Coffey Report appears to have largely focused on the provision of specialized education services, it also found that MHS "fail[ed] to have proper reporting mechanisms or complete reporting of incidents," violated various BPS policies, rules and procedures, and had a "culture of fear, threats, or intimidation."  2022 HA Phase I Report at 18–19 (discussing the findings of the 2015 Coffey Report).[14]  The 2015 Coffey Report also recommended, based on its finding, that Ms. Gavins be disciplined, but she was not.  Further, as noted in the 2022 HA Phase I Report "from 2014 to 2017, [BPS] received numerous complaints by parents and members of the [MHS] community reporting inappropriate sexual touching and sexual misconduct that occurred at [MHS]," including by students against other students.  Id. at

---

[14] BPS may have had even earlier notice of MHS's lack of appropriate reporting mechanisms, at least related to incidents of sex-based misconduct involving staff and students.  The 2022 HA Phase I Report details that in November 2014 an MHS staff member ("MH Staff 42") "was arraigned in Boston Municipal Court on charges of indecent assault and battery of a child under fourteen years of age [an MHS student]."  2022 HA Phase I Report at 81.  The staff member ultimately "pleaded guilty to two counts of indecent assault and battery on a child under fourteen."  Id.  BPS investigated the incident.  Id. at 81–82.  BPS learned that another staff member had, during the previous winter, "observed [the MHS student] . . . sitting on the lap of an adult in a darkened classroom," who was ultimately identified as MH Staff 42.  Id. at 81.  At the time, the staff member reported this to another staff member, who in turn told Ms. Gavins.  Id.  BPS investigators found that Ms. Gavins "fail[ed] to properly report or take any action about the incident reported to [her] during the winter of 2014," and that "[t]his failure to take any action . . . and [her] inability to remember any staff reporting a potentially serious incident . . . suggests a lack of complete understanding of [her] responsibility to investigate any allegation made by a staff member concerning adult behaviors involving children in order to provide a safe learning environment for them."  Id. at 82.

20.[15]  This included <u>Doe1 v. Bos. Pub. Schs.</u>, filed in June 2017.  <u>Id.</u>  Although Ms. Gavins and

others at MHS may have taken steps to ensure that BPS did not learn of the issues at MHS, the

Court finds that the allegations discussed above allow the reasonable inference that the COB had

at least constructive knowledge of incidents of student-on-student harassment and MHS's under-

reporting of those incidents, possibly as early as 2015, but did not take action to address these

issues.  Additionally, in the fall of 2018, the Does actually informed Superintendent Al Taylor of

the physical bullying that Joseph experienced at MHS over many years, which was not being

reported.  Again, Plaintiffs allege the COB did not take action in response to these concerns,

until it commissioned the 2021 Coffey Report.  From this, the Court can, in turn, reasonably infer

either that COB failed to adequately train MHS staff on reporting[16] and was deliberately

indifferent to that failure, or that reports were being suppressed for some other reason and, again,

the COB did nothing to address this issue.  The Amended Complaint could be more fulsome with

respect to the alleged municipal customs, and Plaintiffs will have to overcome significant issues

of proof if they are to prevail at trial.  Nonetheless, the Court finds that, at this stage, Plaintiffs

have adequately pleaded municipal liability for violations of Joseph and Casey's right to bodily

integrity based on the role that municipal custom and lack of training allegedly played in the

---

[15] As one example, the 2022 HA Phase I Report found that Ms. Gavins emailed various BPS staff members in the fall of 2016 to discuss issues related to "sexualized conduct" with MH Student 1 (who appears to be A., the subject of <u>Doe1 v. Bos. Pub. Schs.</u>).  2022 HA Phase I Report at 68–69.  She gave an October 2016 email the subject line: "update on issues with my student that touches."  <u>Id.</u>  The Report notes that "Central office personnel responded but did not offer a firm solution."  <u>Id.</u>

[16] Potentially recognizing as much, the 2021 Coffey Report recommended that MHS staff and leadership "receive continuing remedial training" in "identifying, investigating, and reporting aggressive behavior that 'may be bullying[,]' . . . [and] creating safety plans to prevent reoccurrence of bullying."  [ECF No. 1-3 at 21].

constitutional violations.  The COB's motion to dismiss these claims is <u>DENIED</u>.

**B.**   **Title IX**

The COB also seeks dismissal of Plaintiffs' claims based on Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681.  Title IX provides that "[n]o person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial

assistance."  20 U.S.C. § 1681(a).  There are two types of sex-based harassment in the

educational milieu that may constitute gender-based discrimination actionable under Title IX: (1)

quid pro quo harassment, which is not implicated in this case, and (2) hostile environment

harassment, which "covers acts of sexual harassment sufficiently severe and pervasive to

compromise or interfere with educational opportunities normally available to students."  <u>Frazier</u>

<u>v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 65 (1st Cir. 2002).

"Student on student harassment can be actionable" under Title IX.  <u>Morgan v. Town of</u>

<u>Lexington</u>, 823 F.3d 737, 745 (1st Cir. 2016) (citing <u>Davis ex rel. LaShonda D. v. Monroe Cnty.</u>

<u>Bd. of Educ.</u>, 526 U.S. 629, 643 (1999)).  "[A] recipient of funding from the United States

Department of Education may be liable for damages if 'its deliberate indifference to [student on

student] sexual harassment "subjects" its students to harassment.'"  <u>Porto v. Town of Tewksbury</u>,

488 F.3d 67, 72 (1st Cir. 2007) (quoting <u>Davis</u>, 526 U.S. at 644).

"[A] funding recipient is not liable under Title IX for all student-on-student sexual

harassment."  <u>Id.</u>  Rather, "the plaintiff must show (1) that he or she was subject to 'severe,

pervasive, and objectively offensive' sexual harassment by a school peer," "(2) that the

harassment caused the plaintiff to be deprived of educational opportunities or benefits," (3) that

the school "knew of the harassment, (4) in its programs or activities and (5) it was deliberately

indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances."  Id. at 72–73.

The COB does not dispute that it is a recipient of federal funding.  The COB primarily argues, see [ECF No. 39 at 14–16], that Plaintiffs' Title IX claims should be dismissed because they have failed to allege conduct that amounts to "severe, pervasive, and objectively offensive" sex-based harassment, Porto, 488 F.3d at 72–73.  The necessary inquiry "depends on a variety of factors, including the ages of the harasser(s) and victim(s), number of individuals involved, and the type, frequency, and duration of the conduct.  This is a highly factual and context-specific determination, begging consideration of a full 'constellation of surrounding circumstances, expectations, and relationships.'"  Doe v. Town of Stoughton, No. 12-cv-10467, 2013 WL 6195794, at *1 (D. Mass. Nov. 25, 2013) (quoting Davis, 526 U.S. at 651).

With regards to Casey, the COB specifically argues that Plaintiffs fail to allege that she experienced sex-based harassment because, given the age of the children involved, the conduct does not evince "gender-based animus."  [ECF No. 39 at 16].  At this early stage of litigation, the Court declines to determine that the alleged conduct, including a first grader in Casey's Kindergarten-2 class, repeatedly asking to "see her underwear, asking her to kiss him, trying to kiss her, physically holding her down, and removing her shoes so she couldn't run away from him," [Am. Compl. ¶¶ 127–128], and other students repeatedly calling her an expletive ("fucking bitch") and "pulling her pants down during and after school," [id. ¶ 136], does not, as a matter of law, result from gender-based animus.  See Bowe v. Eau Claire Area Sch. Dist., No. 16-cv-00746, 2017 WL 1458822, at *3 (W.D. Wis. Apr. 24, 2017) ("whether the use of 'gendered words like bitch and whore' by young children constitutes sexual harassment under Title IX is a 'subtle' issue."); cf. Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 172 (1st

Cir. 2007) ("it cannot be gainsaid that, if true, [a child's] allegation—that she [then a

kindergartener] was [repeatedly] forced to pull up her skirt, drop her underpants, and spread her

legs [by a third grader]—constituted severe, pervasive, and objectively offensive harassment."),

rev'd and remanded on other grounds, 555 U.S. 246 (2009).  Properly accepting as true all

well-pleaded facts and drawing all reasonable inferences in the light most favorable to Plaintiffs,

Hutcheson, 647 F.3d at 383, the Court finds that Plaintiffs have adequately alleged sex-based

verbal and physical harassment that "had a concrete, negative effect on [Casey's] ability to

receive an education."  Davis, 526 U.S. at 654.  The Court thus finds that Plaintiffs adequately

allege that Casey suffered "severe, pervasive, and objectively offensive" sex-based harassment.

Id. at 652

　　　　As to Joseph, the COB argues that the arguably sex-based conduct that Joseph allegedly

experienced was merely "teasing" and "an adjunct of the gender-neutral bullying Doe was

experiencing."  [ECF No. 39 at 15–16].  "Damages are not available for simple acts of teasing

and name-calling among school children, . . . even where these comments target differences in

gender."  Davis, 526 U.S. at 652.  That said, courts in this circuit have recognized that a

consistent pattern of sex-based name-calling and other verbal harassment may sustain a Title IX

claim, particularly when experienced with physical bullying.  See Thomas, 267 F. Supp. 3d at

308 (finding that after an incident of physical sex-based assault, although "much of the bullying

[over the following year] was gender-neutral, plaintiffs presented evidence of pervasive sexual

taunting sufficient to constitute a hostile educational environment."); id. at 308 (explaining that

"the District Court[, in Snelling v. Fall Mountain Regional School District,] denied the

defendants' motion for summary judgment based on evidence of sex-based harassment where the

student was subjected to repeated homophobic name-calling and taunting because of the

student's failure to meet sex-based expectations of masculinity." (citing <u>Snelling v. Fall Mountain Reg'l Sch. Dist.</u>, No. 99-cv-00448, 2001 WL 276975 (D.N.H. Mar. 21, 2001)); <u>cf. Morgan v. Town of Lexington</u>, 823 F.3d 737, 745 (1st Cir. 2016) (recognizing that "in some cases one could 'use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct,'" but finding that "such an inference [wa]s not reasonable . . . [in the instant case], where there [wa]s only one incident that can even arguably be deemed sex-based."); <u>see also</u> <u>Pratt v. Indian River Cent. Sch. Dist.</u>, 803 F. Supp. 2d 135, 151–52 (N.D.N.Y. 2011) (denying motion to dismiss Title IX claim where plaintiffs plausibly alleged harassment based on student's "nonconformity, or perceived nonconformity, to sexist stereotypes" including being "repeatedly called names like 'pussy,' 'sissy,' and 'girl,' and . . . mocked with effeminate gestures," where student ultimately "withdr[e]w from school.").  Here, Plaintiffs allege that Joseph experienced years of verbal harassment related to his long hair and choice of clothing, "more traditionally associated with females," and being called "Miss," in addition to years of physical bullying, before withdrawing from MHS.  [Am. Compl. ¶¶ 69–70].  The Court finds that these allegations are sufficient at this stage to allege "severe, pervasive, and objectively offensive" sex-based harassment.

The COB also argues that it was not deliberately indifferent to this conduct.  [ECF No. 39 at 14].  "A funding recipient is deliberately indifferent to . . . harassment when 'the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'  '[T]he deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it.'" <u>Porto</u>, 488 F.3d at 72 (citing <u>Davis</u>, 526 U.S. at 645, 648).  The Title IX deliberate indifference standard also "demands that a funding recipient be shown to have had actual knowledge of the harassment," which requires that

"the official who is informed of the alleged harassment be a person who, at a minimum, has the authority to institute corrective measures."  Santiago v. Puerto Rico, 655 F.3d 61, 73–74 (1st Cir. 2011).  The Amended Complaint contains numerous allegations that the Does and Ms. Roe informed Ms. Gavins of the conduct described above and that Ms. Gavins did nothing to address their concerns, thereby putting Joseph and Casey at greater risk of further harassment.  The Court finds this is sufficient to allege deliberate indifference at this stage.  See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009) ("[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference." (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998))).  The COB's motion to dismiss the Title IX claims is therefore DENIED.

### C.      IDEA Exhaustion

Finally, in its motion, the COB argues that Plaintiffs' ADA and Rehab Act claims must be dismissed because Plaintiffs did not exhaust their administrative remedies, as required by the Individuals with Disabilities Act ("IDEA").[17]  [ECF No. 39 at 17].  Plaintiffs respond that their claims are not subject to the IDEA's exhaustion requirement for several reasons, including that "Joseph Doe and Casey Roe are seeking monetary damages for physical and emotional injuries [and] [t]he IDEA only provides for equitable relief limited to future special education and reimbursements . . . for education-related expenditures."  [ECF No. 42 at 19].  In a Notice of Supplemental Authority, the COB indicated it was withdrawing its arguments "to the extent . . . [they] include Plaintiffs' claims for compensatory damages under the ADA and Section 504," in

---

[17] The COB also moved to dismiss Plaintiffs' § 1983 claims based on a right to a public education on this ground, but as discussed infra, the Court has dismissed those claims.

light of recent Supreme Court case, Luna Perez v. Sturgis Pub. Sch., 598 U.S. 142 (2023), but

maintaining its arguments that "that Plaintiffs' claims for prospective relief under the ADA and

Section 504 are barred because Plaintiffs did not exhaust their administrative remedies as

required by the IDEA."  See [ECF No. 57 at 2].

Section 1415(*l*) of the IDEA requires aggrieved individuals to exhaust their

administrative remedies prior to filing a lawsuit.  Frazier, 276 F.3d at 59 (citing 20 U.S.C.

§ 1415(*l*)).  This "exhaustion principle 'applies even when the suit is brought pursuant to a

different statute so long as the party is seeking relief that is available under subchapter II of [the]

IDEA.'"  Id. (quoting Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000)).  That said, "by its . . .

limiting language [§ 1415(*l*)] does not apply to *all* suits seeking relief that other federal laws

provide."  Luna Perez, 598 U.S. at 147 (emphasis in original).  "If . . . the remedy sought is not

for the denial of a [so-called free appropriate public education ('FAPE')], then exhaustion of the

IDEA's procedures is not required."  Fry v. Napoleon Cmty. Sch., 580 U.S. 154, 168 (2017).

Relatedly, although the First Circuit has previously held that "plaintiffs who bring an

IDEA-based claim . . . in which they seek only money damages, must [first] exhaust the

administrative process available under the IDEA," Frazier, 276 F.3d at 64, the Supreme Court

recently clarified in Luna Perez, that "[t]he statute's administrative exhaustion requirement

applies only to suits that 'see[k] relief . . . also available under' IDEA," 598 U.S. at 147

(emphasis and second and third alterations in original).  As the Supreme Court explained, "that

condition simply is not met in situations . . . where a plaintiff brings a suit under another federal

law for compensatory damages—a form of relief everyone agrees IDEA does not provide."  Id.

at 147–48.[18]

---

[18] Under the IDEA, "[c]ourts and hearing officers may award relief including compensatory
education and reimbursement of educational expenses, both of which are considered equitable

Although the First Circuit has not yet addressed the implications of Luna Perez, courts in other circuits have consistently interpreted it as holding that exhaustion is not required when plaintiffs seek only money damages, in contrast to the equitable relief available under the IDEA. See, e.g., Doe ex rel. Shefke v. Macomb Intermediate Sch. Dist., No. 22-1283, 2023 WL 3698219, at *2 (6th Cir. May 23, 2023) ("The parties dispute at length whether [the] complaint alleges the denial of a FAPE.  But in light of Perez, we need not decide that question to resolve this appeal: the complaint seeks monetary damages only and thus, pursuant to Perez, is not subject to the IDEA's exhaustion requirement."); cf. I. K. ex rel. Christopher K. v. Manheim Twp. Sch. Dist., No. 22-1347, 2023 WL 3477830, at *4 (3d Cir. May 15, 2023) (distinguishing from Luna Perez and finding exhaustion was required where plaintiffs sought "tuition reimbursement and compensatory education").[19]

Here, based on both the Complaint and Plaintiffs' representations in their briefing, it appears that Plaintiffs seek compensatory damages rather than equitable remedies.  See, e.g.,

_____

remedies. . . . Such reimbursements are distinct from 'damages.'" Roe v. Healey, 78 F.4th 11, 16 (1st Cir. 2023) (citations omitted).  "In contrast, tort-like general damages are not available under the IDEA."  Roe v. Healey, 78 F.4th 11, 16 (1st Cir. 2023) (citing Luna Perez, 598 U.S; Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 19 (1st Cir. 2006)).

[19] See also Farley v. Fairfax Cnty. Sch. Bd., No. 21-1183, 2023 WL 3092979, at *1 (4th Cir. Apr. 26, 2023) ("[t]he district court's application of the IDEA's exhaustion requirement to Plaintiffs' claims seeking compensatory damages . . . conflicts with Luna Perez and cannot be sustained."); J.C ex rel.Chavez v. Brownsville Indep. Sch. Dist., No. 22-40085, 2023 WL 3918987, at *2 (5th Cir. June 9, 2023) (same, as to claim for money damages rather than equitable relief); Piotrowski v. Rocky Point Union Free Sch. Dist., No. 18-cv-06262, 2023 WL 2710341, at *8 (E.D.N.Y. Mar. 30, 2023) ("The Supreme Court recently clarified the application of [§ 1415(l)] to damages claims, by holding—contrary to suggestions in earlier Second Circuit case law— . . . claims for money damages alone are not subject to IDEA exhaustion." (citing Luna Perez, 143 S. Ct. at 864)); cf. Li v. Revere Loc. Sch. Dist., No. 21-3422, 2023 WL 3302062, at *13 (6th Cir. May 8, 2023) (finding plaintiffs were required to exhaust administrative remedies, because, unlike in Luna Perez, it was "unclear from the [] complaint whether [plaintiffs] seek compensatory damages . . . or some other form of relief like a compensatory education, reimbursement, or equitable relief like expungement of T.L.'s disciplinary record").

[Am. Compl. at 35 ("Joseph Doe and Casey Roe request judgment against the defendants in an amount sufficient to compensate them for their injuries . . ."); ECF No. 42 at 19 ("Joseph Doe and Casey Roe are seeking monetary damages for physical and emotional injuries.")].  Thus, at this early stage, the Court finds that Plaintiffs' ADA and Rehab Act claims are not subject to the IDEA's exhaustion requirement.  If it becomes clear as the case progresses that they do in fact seek equitable remedies, such as educational reimbursement, in addition to or instead of compensatory damages, the Court will re-evaluate whether exhaustion is required.  See Luna Perez, 598 U.S. at 150 ("Under our view, . . . a plaintiff who files an ADA action seeking both damages and the sort of equitable relief IDEA provides may find his request for equitable relief barred or deferred if he has yet to exhaust § 1415(f) and (g).").  The COB's motion to dismiss Plaintiffs' ADA and Rehab Act claims is DENIED.

**IV.       CONCLUSION**

Accordingly, the COB's motion to dismiss, [ECF No. 38], is GRANTED in part and DENIED in part.  The COB's motion to dismiss Plaintiffs' § 1983 claims based on a right to a public education is GRANTED.  The motion is otherwise DENIED.

**SO ORDERED.**

September 27, 2023                                        /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE